NATIONAL LABOR RELATIONS BOARD
v. AUBURN FOUNDRY, Inc.

No. 7487.

Circuit Court of Appeals, Seventh Circuit.

April 2, 1941.

Robert B. Watts, Gen. Counsel, and Edwin E. Huddleson, Jr., both of Washington, D. C., for petitioner.

Walter D. Stump, of Auburn, Ind., for intervener.

Dan M. Link, of Auburn, Ind., for respondent.

Before SPARKS and MAJOR, Circuit Judges, and WOODWARD, District Judge.

MAJOR, Circuit Judge.

This is a petition by the National Labor Relations Board for the enforcement of an order issued against respondent, pursuant to Section 10(c) of the National Labor Relations Act, Title 29 U.S.C.A. § 151 et seq.

Respondent is a manufacturing concern located in the City of Auburn, Indiana. The incidents relevant to the controversy occurred largely in the latter half of 1937, and the early part of 1938. Prior to the advent of the labor organizations involved, there had been no organization among respondent's employees. The complaint was filed with the Board March 28, 1938, by Lodge 1998 of Amalgamated Association of Iron, Steel and Tin Workers of North America, an affiliate of the C. I. O., (hereinafter referred to as the "C. I. O.") and alleged, in substance, that on or before September 17, 1937, a majority of respondent's employees had designated the C. I. O. as their representative for the purpose of collective bargaining, and that respondent had refused to recognize it as a bargaining agent. It was also charged that respondent had instigated the formation of the De-Kalb Iron Workers Association, Inc. (hereinafter referred to as the "Association"), and had engaged in unfair labor practices in promoting and maintaining such organization. It was further charged that Robert Livergood and Arthur Miller were discharged on account of membership and activity in the C. I. O.

The Association was permitted to intervene, file an answer, and participate in the proceeding. At the hearing before the Examiner, the complaint was amended as to Arthur Miller so as to show that he was laid off rather than discharged, and that such lay off was due to his C. I. O. activities. During the hearing before the Examiner, it was conceded by counsel for the Board that the C. I. O. at no time had a majority of respondent's employees, and the charge that respondent had refused to bargain with it, was dismissed. The Board found jurisdiction (not in dispute) and that the respondent, by various acts of interference, restraint and coercion, had violated Section 8 of the Act; had dominated, interfered with and contributed to the Association in violation of Section 8(1) and (2); and had discharged Robert Livergood and laid off Arthur Miller because of their C. I. O. membership and activity in violation of Section 8(1) and (3). The usual cease and desist order was made, and respondent was affirmatively ordered (a) to withdraw all recognition from, and completely disestablish, the Association as a collective bargaining representative of the employees, and (b) to offer reinstatement with back pay to Livergood and Miller.

■ The essential question presented is whether the record substantially supports the finding of the Board. In view of our limited authority in a case of this character, it seems almost useless to undertake any detailed discussion of the facts and circumstances. Notwithstanding such limitation, however, we are charged with the duty of determining whether the finding of the Board, upon which its order rests, is supported by substantial evidence. This, of course, requires a study of the evidence in each case. Especially is this true in a case, such as the instant one, where counsel for the respondent insist, with a sincerity which can not be doubted and with considerable plausibility, that the findings of the Board are not supported by facts but are based largely upon unfair and unreasonable inferences, speculation, conjecture and surmise.

■ We shall make brief reference to some of the attacks made upon the findings of the Board. The first statement of the Board in its decision, as well as in its brief, in its discussion of unfair labor practices, refers to the fact that for several weeks after the C. I. O. started to organize, it was unable to obtain a meeting place in Auburn. There is not a scintilla of evidence that respondent was in any way responsible for this situation, and we agree that it is wholly immaterial to any issue involved, and we are unable to conceive its purpose. The fact that the businessmen of the community were opposed to the C. I. O. might indicate that that organization was in disrepute, but it is not a circumstance bearing directly or otherwise upon any issue in the case.

■ Respondent points out, in every instance where there was a conflict on a material matter between a witness for the Board and the Association or respondent, the Board gave credit to its own witness and found, as a fact, that such witness was stating the truth. A reading of the record leaves no room for doubt but that the situation is as charged. But even so, we do not think it is within our province to say that the Board was not within its legal right. The Board apparently has the right to place its stamp of approval upon its own witnesses as against the world, if it so desires.

■ Another charge directed at the Board has to do with a stipulation entered into, at the commencement of the hearing before the Examiner, on behalf of the Board, respondent and the Association, providing that an election would be held for the purpose of determining a bargaining agent for the employees. It was a part of the stipulation that if the Board should hold the Association was a lawful union, then the names of both the Association and the C. I. O. should be placed upon the ballot; but if the Board should hold the Association was not a lawful union and entitled to recognition as such, then, in that event, an election nevertheless should be held but the ballot should be made up so that the employees could simply express their preference for or against the C. I. O. Pursuant to this stipulation, the Board ordered an election without fixing the date therefor. On October 20, 1939, the Board issued a supplemental decision and amended direction of election, providing that the same be held not later than 30 days therefrom. It was stated in this amended direction that the purpose of delaying the election formerly directed "was to allow time for the dissipation of the effects of the unfair labor practices directed by the company against the Amalgamated." On November 16, 1939, a second amended direction of election was issued

by the Board providing that the election be held not later than 60 days from that date. A third amended direction of election was issued by the Board on December 15, 1939, indefinitely postponing the election. On August 20, 1940, the Board issued an order vacating and setting aside all previous orders with reference to an election.

It is argued that the Board, realizing that a majority of the employees were opposed to the C. I. O., refused to abide by its agreement and thereby displayed its partisan attitude. We judge from statements contained in the orders continuing and finally vacating the orders for direction of an election that the Board's theory was that a fair election could not be held. To our minds this is a feeble excuse in any event, and especially so in view of its solemn agreement to call an election. This case is another illustration where, in our judgment, a controversy could have been amicably adjusted by an election where the employees could have, by secret ballot, expressed their preference. We have no sympathy with the theory sometimes advanced, that employees in any ordinary situation are incapable of expressing themselves by secret ballot in a manner consistent with their welfare. To think otherwise is to disparage their intelligence. While we agree that the failure of the Board to do that which it agreed to do was without justification, yet respondent fails to point out any relief which we can give in the matter. We think we are without authority to compel compliance with the stipulation, and we do not see how the Board's failure to perform can be assigned as a reason for denying its petition for enforcement.

■ The Board found that the distribution of certain literature constituted a violation of Section 8(1) of the Act. We agree with respondent that this finding is not tenable. The literature referred to appears to have been prepared by the National Association of Manufacturers, and purports to contain facts concerning the Wagner Act. Admittedly, it was distributed among the employees by respondent. The pamphlets, in question and answer form, contain six questions and the answers thereto. In answering these questions, Senator Wagner of New York, author of the bill, and Senator Walsh of Massachusetts, one of its active proponents, are quoted. Statements from opinions of

the Supreme Court of the United States, as well as from the report of the Committee on Labor of the United States House of Representatives, are also used in answering questions. It is not disputed but that the questions were correctly answered, but it is said it avoids "any description of the true intendment of the statute." The theory seems to be that it was calculated to mislead with respect to employees' rights under the act. We do not believe it is reasonably capable of such construction. It does not purport to be a copy of the act, but correctly answers certain questions then much in controversy. A copy of the act itself would have been even less illuminating, as is evidenced by the fact that the Board, as well as many courts, has devoted much effort to its interpretation, and in defining the rights of both the employer and employees. There was no evidence that the pamphlet actually deceived any person, and, in our judgment, it is not susceptible of the construction that it was calculated so to do.

What we have said, however, is somewhat incidental and not determinative of whether there is otherwise any substantial support for the order. Both the respondent and Association, (intervenor) while recognizing our lack of authority to weigh the testimony, nevertheless, in effect, request us so to do. In their briefs they present a rather convincing argument that respondent was guilty of no unfair labor practice as it pertains either to the Association or the C. I. O. The argument made is supported by testimony in the record, but, on the other hand, testimony is overlooked which, in some important instances at least, furnishes support to the Board's ultimate findings.

■ No good purpose could be served in analyzing the conflicting testimony. That has been done by the Board and we shall only refer briefly to certain testimony relied upon by it. The C. I. O. began its campaign to organize respondent's employees in June, 1937. In connection therewith, they distributed a pamphlet called "The Steel Worker," which was criticized by respondent's president. That the officials of respondent made statements on numerous occasions evidencing their serious disapproval of the C. I. O. is clearly shown. Some of these statements, standing alone, furnish no ground for complaint, but they disclose a hostile attitude which, when considered in connection with other state-

ments and activities, become relevant to the issues involved. There is testimony, if believed (and the Board believed it), that Fink (respondent's president) threatened to close the plant rather than deal with "outside" labor organizations. In addition to the attitude and statements of Fink, there is considerable testimony to the effect that a number of officials displayed a hostile attitude toward the C. I. O., and that two of such officials denounced the C. I. O. as "a bunch of communists and thugs" who "would get your money and wouldn't do you any good." There was also evidence that certain employees were threatened with discharge if they became members of the C. I. O. and that certain employees were under surveillance because of C. I. O. activity. Upon testimony of this general character, the Board concluded that respondent was guilty of interference, coercion and restraint in violation of Section 8 (1) of the Act. We are not permitted to say that its conclusion in this respect is without substantial support.

█ The Association had its origin on or about April 10, 1937. There was no direct evidence that it was instigated by respondent, although we think it might be reasonably inferred that such was the case. That respondent preferred the Association is apparent. This preference, however, was legitimate, provided no affirmative act was committed or statement made with a view of assisting its organization or maintenance. In this respect we are of the view that there is testimony which supports the facts, or at least, sufficient facts upon which the Board's conclusion is predicated.

█ One employee testified that the assistant superintendent, in referring to a shop committee, suggested—"How about noising that around the shop?" On the following morning four employees met in respondent's office and apparently discussed the idea of an independent organization. The Board stresses the fact that this meeting was held in the company office, but to us it is without significance. At any rate, on the following morning, a petition favoring "a shop union" was circulated, and membership application cards were distributed in the plant. Solicitation of employees to sign such cards was carried on in the plant openly and actively without objection by foremen or officials. In fact, it is a reasonable inference that the fore-

men or some of them took a rather active part in the campaign to establish the Association. There is evidence that an employee was told by his superintendent that he was "on the wrong side of the fence." Certain employees were assured that the company would recognize the Association. One employee was told by a foreman—"I give you a job and I think you ought to sign with the shop union." Another employee was told by his foreman that the ones that "sign with the organization would get a nickel raise." Another witness testified that he heard a foreman tell one of the employees "to talk to the rest of the employees and try to get them to sign with the Association."

Representatives of the C. I. O., on September 17, 1937, met with Fink for the purpose of collective bargaining. According to their testimony, Fink stated: "He didn't know whether he would deal with us"; that "he wasn't sure whether he would consent to an election"; that "the Board could not force him to deal with us," and that "he would go out of business before he would deal with us—over his dead body was the way he put it." There are other facts found by the Board, some of which, we think, are supported and some not; · some perhaps material and some, to us, without significance, but no good purpose would be served in a further discussion. While the proof is not convincing in support of the Board's conclusion that respondent's relation with the Association was violative of Section 8(1) and (2), yet we think it must be held that there is evidence supporting the facts upon which such conclusion is predicated. ·

The Board found the respondent guilty of an unfair labor practice within the meaning of Section 8(3) of the Act, by the discharge of Robert Livergood because of his C. I. O. activity. Ten pages of the Board's decision and order, as it appears in the printed record, are devoted to a discussion of the circumstances surrounding this alleged discharge, and we have difficulty in following the Board's reasoning from which it arrives at its ultimate conclusion. There is no direct evidence to support the Board's finding, but a number of inferences are relied upon. It is of some significance, we think, that Livergood was the only member of the C. I. O. who, it is claimed, was discriminately discharged. The record does not disclose the number of employees belonging to the C. I. O., al-

though it was shown that the total number of employees was around 300, and the C. I. O. claimed and charged that it had a majority thereof. The fact that only one unlawful discharge is claimed rather clearly demonstrates that respondent pursued a policy contrary to that charged in this isolated instance.

Livergood had been employed at respondent's Auburn plant for a number of years. A short time before the alleged discharge, he was transferred to a new plant put in operation by respondent at Columbia City, some forty miles away. Some of respondent's Auburn employees were transferred to the new plant. Livergood himself describes the circumstance of this transfer, as follows:

"Q. Did Mr. Rowan say whether you had to go to Columbia City or not? A. He made it specific that it was not compulsory to go.

"Q. Did he say whether you would have further work at the foundry if you didn't go to Columbia City? A. We would have to be laborers.

"Q. Up here? A. Yes, sir.

"Q. So then you went down to work at Columbia City? A. Yes, sir."

The Board goes to considerable length to satisfy itself that Livergood was an efficient worker at Auburn. We assume that such was the case. At Columbia City he was assigned to work on a machine as a common laborer or helper, in connection with three other employees, one of whom was Smurr, an experienced workman and machine operator. His foreman at Columbia City was Corrello. Respondent contends that Livergood was discharged, or severed his employment because of a controversy regarding his inability or refusal to properly do the work assigned him. Such contention is predicated upon testimony that Smurr complained to Rowan, (superintendent at Auburn) that Livergood failed to satisfactorily perform his part of the work; that Rowan talked to Corrello (superintendent at Columbia City) about Smurr's complaint, and left the matter up to Corrello. The Board found "the record establishes to our satisfaction that Smurr was not, in fact, dissatisfied with Livergood's work and had not complained about Livergood." This appears to be the real basis for the Board's ultimate conclusion. Smurr was a member of the C. I. O. and had worked with Livergood for a number of years. He was called as a witness by the respondent, and a reading of his testimony is convincing that he was a reluctant but truthful witness. It is apparent that he preferred not to give testimony which would be detrimental to Livergood. Livergood, Smurr and others worked upon a machine together, and the total amount earned was divided among them. In substance, Smurr testified that he was dissatisfied with his pay and that he talked to Rowan about it. He testified that Livergood was the cause of his decreased pay. After his reluctance to give testimony unfavorable to Livergood was thoroughly demonstrated, he was asked by counsel for the respondent: "Q. Didn't you say to Mr. Rowan when you were talking to him, when he inquired of you what was the matter, as you have testified, that Livergood either didn't or wouldn't keep up his end or do his work, something to that effect?" and he answered: "A. I believe I did, yes."

The reason assigned by the Board for disbelieving Smurr's testimony is that it repudiates testimony previously given and "was secured in such an improper manner by counsel for respondent." His testimony, as a whole, is not capable of such construction. True, the last question propounded was leading and suggestive, but after his reluctant, if not hostile, attitude toward respondent was shown, we are of the opinion that the leading form of the question was not objectionable. Furthermore, the Board is in no position to criticize a question because of its leading form. If all the answers obtained by such questions were deleted from this record, the Board would find itself well near stripped of evidence. Smurr's testimony that he complained to Rowan stands uncontradicted. We do not believe even the Board has the right to completely ignore it. Not only that, his testimony is corroborated by Corrello, who says that Rowan relayed to him the complaint made by Smurr. Corrello testified that when he talked to Livergood regarding the situation, Livergood abused him with language which he would not care to repeat in public. Livergood, of course, denied this and his version is to the effect that he was requested to work on another job which he did not want to do, and, thereupon, he left under the impression that he was being sent back to Auburn.

The Board relies upon an incident which, according to the testimony of Livergood, took place about ten days prior to the alleged discharge, wherein Rowan told him that he was on the wrong side of the fence and that "if he would string along with them (referring to the Association) he would be sure of his job." (Rowan had died previous to the hearing.) The Board, in referring to the job which was offered Livergood by Corrello, finds as follows: "We find that this job offered to Livergood constituted a demotion." Considerable argument is made in support of this finding. To us it is immaterial. We are of the view that respondent had the same right to demote as it had to discharge, and it had a right to do either, provided, of course, it was for some reason other than his C. I. O. activity.

Corrello, foreman at the Columbia City plant, had only served as such for a period of about two weeks. There is not a scintilla of evidence that he had any information that Livergood was a member of the C. I. O., or of his activities in that respect. He was solely responsible for what happened to Livergood, whether it be designated as a demotion or discharge. The inference which the Board draws from the situation that he was discriminated against because of his C. I. O. activity, must, in our judgment, give way to the positive, convincing testimony that his employment was terminated because of the inefficient manner in which he performed his work. It is therefore our conclusion that the finding of the Board as to Livergood is without substantial support.

The Board found that Arthur Miller was discriminately laid off November 12, 1937. It was respondent's customary practice, when reduction of its force was required, that it be done on the basis of seniority. That Miller's lay off was due entirely to his seniority status is respondent's contention. There is no dispute but that he was employed from December 10, 1934, until February, 1936, when he was laid off. After this lay off, he obtained employment elsewhere which lasted until June 11, 1936. June 12, 1936, he was re-employed by respondent. It is the Board's theory that his seniority dated from December 10, 1934, while it is respondent's position that it dated from June 12, 1936. Respondent, in support of its theory, sought to prove that after Miller's lay off in February, 1936, he was notified to return to work but failed to do so, and as a result, his seniority status was terminated. The Board disputes that he was at any time notified to return to work and, therefore, his seniority status remained intact from the earlier date. We will not detail the testimony regarding this issue. A finding was made by the Board adversely to respondent's contention and under the decisions of the Supreme Court it is substantially supported.

Miller was Vice President of the C. I. O. and one of its active organizers. The Board found it was because of such membership and activity that he was laid off at the time in question. Miller testified, in effect, that about three months prior to his lay off, he was told by his foreman that those who joined the C. I. O. would soon be looking for a new job. The Board credited his testimony in this respect and reasoned that this testimony, in connection with the fact that he was active in the affairs of the C. I. O., having recently been elected its Vice President, raised a reasonable inference that his lay off was the result of discrimination.

A study of the situation does not convince us that we should interfere with the Board's finding in this respect. Especially is this true in view of the fact that we agree with the Board's finding that the lay off was not due to his seniority status—the only reason assigned by respondent.

The Board's petition for enforcement of its order is allowed except as it pertains to the reinstatement of Robert Livergood, and in that respect, it is denied.