BERKSHIRE KNITTING MILLS *v.* NATIONAL LABOR RELATIONS BOARD.

No. 7255.

Circuit Court of Appeals, Third Circuit.
Argued Oct. 18, 1943.
Decided Dec. 1, 1943.

Joseph W. Henderson, of Philadelphia, Pa., (Rawle & Henderson, of Philadelphia, Pa., Bertolet & Bertolet, of Reading, Pa., Jean deB. Bertolet and Frederick J. Bertolet, both of Reading, Pa., George M. Brodhead, Jr., of Philadelphia, Pa., and Wellington M. Bertolet, of Reading, Pa., on the brief), for petitioner.

Joseph B. Robison, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Joseph B. Robison and John H. Garver, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before JONES, GOODRICH, and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

■ This case bids fair for the unenviable distinction of being the Jarndyce v. Jarndyce of labor law. The complaint was issued November 6, 1937. The case has been once before this Court.[1] It was remanded to the Board and is now again before the Court on petition by Berkshire to review and set aside the Board's order, and on petition by the Board for enforcement. Berkshire makes much of the long interval which has elapsed and urges that it has thereby been denied speedy justice and due process of law. The delay is greatly to be regretted and is contrary to the express general policy of the Act. It is to be noted, however, that the case has been vigorously contested at every stage of the proceedings by Berkshire. No criticism is implied of counsel for pressing a client's position in every stage of litigation. That is what he is retained for. But contested litigation obviously takes more time than the decision of a matter on undisputed facts or findings. Berkshire, however, makes no charge that the delay was intentional or designed to prejudice its position. Nor does it show that the delay was prejudicial except insofar as it affects the back pay order of the Board, a matter to be discussed more fully later. The delay occasioned by protracted hearings involving weeks of testimony, hundreds of pages of record and innumerable motions, exceptions and the like, and one appeal, cannot be called lack of due process of law.

■ Other procedural points raised by Berkshire will be considered before turning to questions concerning proof of unfair labor practices. When the case was here before it was ordered remanded to the Labor Board for that body to consider whether there was evidence that one of its members had shown such bias that it was improper for him to participate in the decision. Shortly after the Court's order, the term of that member expired. Upon the petition of the Board the Court resettled its order permitting the Board's former order to be set aside and the whole case to be remanded for further argument, reconsideration, findings and order. The Board, at its further hearing and pursuant to the order of this Court, did not go into the question of the bias of former member Smith. Berkshire complains thereof. We think there is no merit in this complaint. The old order was set aside, the case was reconsidered in its entirety by the new Board, two members of which had not been on the

---

[1] Berkshire Employees Ass'n of Berkshire Knitting Mills v. National Labor Relations Board, 3 Cir., 1941, 121 F.2d 235.

Board at the time of the first order. We see no reason, therefore, why attention should have been deflected from this proceeding to examine the alleged bias of the former member.

Berkshire urges error in failing to permit it to adduce certain other matters including some interoffice communications among Board members, testimony disclosed by Congressional investigation, and so forth. These points were considered individually in our former opinion and the discussion need not be repeated again here.

■ Prior to the second hearing Berkshire filed an application for a subpœna asking for the production of certain documents "and such portions of the minutes of American Federation of Hosiery Workers, Branch No. 10, as are relevant to the allegation in the Board's complaint that said strike was caused by unfair labor practices on the part of the respondent." Berkshire now complains that the Union was not required to produce all of its minutes, pointing out that only those portions of the minutes which witness Adams, who produced the records, thought relevant to the cause of the strike were put in evidence. It may be noted that the terms of the subpœna required only those portions of minutes to be produced. Berkshire's complaint narrows down to the fact that it was not allowed to go over all the minutes to find stated therein that the cause of the strike was economic and that the trial examiner did not do this. However, the Board did find that some of the motivating factors of the strike were economic in nature. Fundamentally, unfair labor practices have their roots in economic strife between employer and employees. Where the causes contributing to a strike consist of unfair labor practices and employee desires for wage betterments, the latter should not excuse the employer from the legal consequences that flow from its conduct which transcends the permissible bounds under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

■■ Complaint is also made that some of the papers brought in response to the subpœna were carbon copies that were not signed. Witness Adams who produced them said, as to the copies, that he did not know where the originals were. Berkshire maintains that it was error to admit the papers under this set of facts for it is not shown that the originals were lost or destroyed, the only condition under which copies would be admissible under the best evidence rule. We have no quarrel with the best evidence rule as Berkshire states it and as worked out by the decisions. But the statute says that the technical rules of evidence shall not be controlling, § 10(b), 29 U.S.C.A. § 160(b). We think that the absence of originals was accounted for well enough and, in any event, the error, if there was error, is harmless, for the reasons stated in the preceding paragraph.

■ Berkshire also complains of the conduct of the trial examiner at the hearing. Insofar as those objections are based upon the examiner's alleged willingness to admit irrelevant testimony their consideration need not add greatly to the length of the opinion. As this Court pointed out in National Labor Relations Board v. Botany Worsted Mills, 1943, 3 Cir., 133 F.2d 876, certiorari denied 1943, 319 U.S. 751, 63 S. Ct. 1164, 87 L.Ed. 1705, responsibility for the decision and order in one of these cases is that of the Board, not the trial examiner. If the Board bottoms its decision on irrelevant or otherwise improper testimony that is subject to review by the court when the question comes up on enforcement proceedings. But the admission of irrelevant testimony, otherwise harmless, while certainly not to be commended because it wastes the time of the litigants and clutters up the record, is not a reason for refusing a petition to enforce an order supported by adequate, competent testimony. So, even if it were true, that the trial examiner let in irrelevant testimony offered by the Board and confined the employer to proof relating to the case, the result is bad trial practice but not lack of due process of law if the ultimate decree is backed by substantial evidence. The same is true of complaints that a hearing room audience became boisterous or that the trial examiner permitted "incitative" speeches by counsel to please the audience. It is, of course, part of the duty of a trial examiner or a trial judge to insure decorum at a hearing. But a Labor Board hearing is not a jury case and what might be sufficient courtroom disturbance to be grounds for mistrial in a jury case is not necessarily a basis for setting aside an order based on the record in this type of hearing. An inspection of the record, however, discloses that there really was substantially nothing to complain of in the hearing in this case. Any disturbance in the smoothness of the hearing prior to the first appeal

to this Court came because all the lawyers involved seemed to disregard the presence of the trial examiner and conducted their own arguments among themselves. Had the examiner asserted himself a little more vigorously, the stenographic record would have been shorter. But that is not a matter of which Berkshire is in a justifiable position to complain. Also without merit is the contention that error was committed in allowing counsel for the Board and Branch 10 to examine four witnesses called by Berkshire as for cross-examination.

Since the complaint of the conduct of the hearing was urged with some earnestness at both the first and the second argument of this case we have gone back over the record and read, consecutively, a great portion of the transcribed notes of the hearing. We do not find, through this laborious examination, any evidence of an atmosphere which was so unfavorable to Berkshire as injuriously to affect its rights. On the contrary, without indicating an agreement with the trial examiner in all the rulings, we think his attitude was fair and impartial to both sides under conditions which it is understatement to describe as difficult.

### The Board's Findings.

The Company attacks the findings made by the Board. We shall review those findings but in so doing must adhere to certain well defined criteria. The findings must be sustained if they are supported by substantial evidence. The credibility of witnesses was for the Board to determine. And, where one of several inferences may be drawn from the evidence, the one deduced by the Board must prevail. We turn then to the evidence and findings.

The Board found that the Company has dominated and interfered with the administration of the Association,[2] contributed to its support and has thus interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in § 7 of the National Labor Relations Act.

The relevant factual history of this case dates back to 1933.[3] There was no labor organization at Berkshire's plant prior to the National Industry Recovery Act. Immediately preceding the Act there was an unsuccessful attempt by Company officials and supervisory employees to establish a plan of employee representation presented by Berkshire's purchasing agent. The plan was rejected at the various meetings of employees called to hear and discuss it. Shortly afterwards there was a strike at the plant which was settled by agreement of the hosiery manufacturers of Reading to arrange an election to determine collective bargaining representatives. Union candidates[4] won the election but Berkshire did not recognize the Union and defeated nonunion candidates were subsequently to play a prominent part in the Association later formed at Berkshire. The first meeting of the Association was held shortly after the strike. While it does not appear clearly from the evidence that the Association was conceived and sponsored by Berkshire, the latter's abortive attempt to form an employee's association prior to the 1933 strike, the character of the Association and the events which followed after its formation certainly permit the inference drawn by the Board that Berkshire's original movement to form an unaffiliated association was continuous thereafter and led to the formation of the Association. And what followed in the years after the Association was formed adequately supports the Board's conclusion that Berkshire dominated, interfered with and contributed to the support of the Association.

The Association has many of the earmarks of a company fostered and dominated union. There is no requirement of dues or attendance at meetings, a quorum being satisfied by the presence of 20 members, which is at the least startling in view of the fact of the Association's claim to over 3000 members. Voting is restricted to employees who have been with the Company for six months and departmental rep-

---

[2] Berkshire Employees Association, Inc., of the Berkshire Knitting Mills.

[3] The history of labor relations at the employer's plant prior to the enactment of the National Labor Relations Act is material evidence. Western Union Tel. Co. v. National Labor Relations Board, 2 Cir., 1940, 113 F.2d 992, 994; National Labor Relations Board v. McLain Fire Brick Co., 3 Cir., 1942, 128 F.2d 393;

National Labor Relations Board v. Trojan Powder Co., 3 Cir., 1943, 135 F.2d 337, certiorari denied, 1943, 64 S.Ct. 76, 88 L.Ed. ——.

[4] The name of the Union, American Federation of Hosiery Workers, was not permitted to appear on the ballot. Branch No. 10, of the Federation, is involved in this proceeding.

resentatives must show employment for five years and lose their status as representatives upon transfer to another department. The five year requirement attaches also to major offices and there is a seven year requirement for office on the advisory council whose function it is to see that the affairs of the Association are properly run.

From its inception the Association found favors easy to obtain from Berkshire, while the Union's requests frequently were turned down or met only after prolonged efforts. It was early accorded a status equal to that of the Union by obtaining, upon written request, a contract with Berkshire at the same time the Union [5] did and upon practically the same terms, although only the Union had participated in the extended negotiations and conferences leading up to the contract. From 1933 on Berkshire permitted the Association to use the recreation hall in the Company owned [6] dispensary building for meetings, for an office and headquarters, and for social purposes. On the other hand, the Union was denied such use. The solicitation of members for the Association was facilitated by permitting employees who had been with the Company for many years and who held positions as instructors with apparent, if not in fact at times real supervisory authority and power to determine which employees would advance, to solicit members on Company time and premises among new employees during their training period. There was evidence that the Company aided the Association to distribute leaflets to the employees on Company time and premises.

The Association appears to have responded to Berkshire's kindness in kind. One wonders in reviewing the Association's activities on behalf of its employees whether the welfare of Berkshire or the employees was the object of the Association's concern. Employee grievances were frequently left at the investigation stage. Employee representatives, who were to present grievances, operated on a basis which secluded them from the Association membership.[7] Although the Association's contract with Berkshire contained an arbitration clause it was never invoked. The contract, itself, appears to have been broken by the Company on several occasions without strenuous objection from the Association. It allowed the Company to eliminate a bonus provision for certain employees by endorsing, after a conference with Berkshire, arrangements which violated the bonus provision. It countenanced or condoned Berkshire's action in breaking the five day, forty hour week, and in introducing a new wage system for certain knitters which reduced their wages, all in violation of the contract the Association had with Berkshire. Some of these departures from the contract were hailed by the Association as indicating progress in collective bargaining. In any event they served to fulfill, at least from the standpoint of the employer, the aim of the Association's constitution to effect a "pleasant mutual understanding between the employees * * and the management." The Association at times became a lobbyist for the interests of Berkshire rather than its employees. It protested against the passage of the Wagner Act, opposed legalization of the closed shop and distributed pamphlets construing the Wagner Act. These pamphlets have found great favor with employers and were frequently used by them in the early days of the Act. The Board has found that the distribution of such pamphlets by the employer has constituted an unfair labor practice.[8] The Association also played a prominent part in trying to prevent a strike sub-

---

[5] Berkshire consistently refused to recognize the Union as the representatives of any of its employees, but dealt with the Union representatives and officials as individual representatives of certain of its employees. The contract thus avoided mentioning the Union. References in this opinion to the Union include Union officials with whom Berkshire had contacts in this sense.

[6] The Company owned the building. However it had leased it to Cooperative Service, an agency composed of representatives of the Company and two neighboring plants, to be operated for the benefit of all three companies. However, it is evident from record that Berkshire sufficiently had control to give permission as to the use of the building.

[7] The employee representatives held their own conferences and kept separate minutes.

[8] Norristown Box Company, 1941, 32 N.L.R.B. 895, 903, affirmed, Norristown Box Co. v. National Labor Relations Board, 3 Cir., 1941, 124 F.2d 429, certiorari denied, 1942, 316 U.S. 667, 62 S.Ct. 1033, 86 L.Ed. 1743. But cf. National Labor Relations Board v. Auburn Foundry, Inc., 7 Cir., 1941, 119 F.2d 331, 334.

sequently called by the Union and in co-operating with the Company to break the strike.

■ Berkshire in effect admits that there is evidence in the record establishing substantially all the facts recited but takes exception to the light in which the facts have been construed. It isolates each episode, considers it alone, in vacuuo, and attempts to explain it away. However, we do not think this is the proper way for us to view the facts. The picture must be considered as a whole and not piecemeal. In that light the parts fall into an integrated and revealing pattern. It shows an employer, hostile to an outside affiliated union and early interested in having at its plant an unaffiliated, employees' representation plan. When such an organization was formed, it was encouraged and received support in many ways from Berkshire. The Association, on the other hand, countered the moves of the Union, assumed on occasions an attitude hostile to labor interests, was disposed to favor the employer in many ways and was not only ineffective as an instrumentality for collective bargaining but condoned the progressive lowering of working standards effected by Berkshire. Upon such a record the conclusion inevitably follows that the Board's finding of domination, interference and support of the Association by Berkshire is supported by substantial evidence.

The conclusion that Berkshire interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in § 7 of the Act, in violation of § 8(1) of the Act, is also supported by substantial evidence. In one instance Berkshire's superintendent compelled retraction of a story appearing in a Union paper, favorable to the Union's interests, by threatening to discharge certain employees. At another time Berkshire refused to negotiate with the Union's president for the reason that he was not a Berkshire employee. Preceding the strike in 1936 Berkshire not only allowed a petition disavowing the proposed strike to be circulated in the plant on Company time, but its foremen participated in the circulation of the petition and there was even resort to an implied threat that failure to sign would lead to dismissal.[9] On another occasion a Berkshire superin-

tendent chose to be present in a building at which the Union had called a meeting where he could see and be seen. During the strike Berkshire supported the police authorities with funds to fight the strike, and secured special deputies appropriately equipped to handle riots, even if the latter had to start one themselves. On several occasions there were either express or implied threats to move the Company's plant.

Here, too, Berkshire has an explanation for each incident. The superintendent who allegedly kept the Union meeting under surveillance, happened to be in the building because he was a member of the club housed there. The article which had appeared in the newspaper, was "highly colored", "provocative," "false and misleading" and a retraction was desired. The purported threats to remove the plant were nothing more than general observations relating to the industry generally in the north, and so forth. However, ours is not the duty to decide which version of these events we would deem significant. That is the function of the Board and there is substantial evidence to support the view it took of these events.

### Reinstatement and Back Pay.

The Board found that Berkshire, by discriminating in regard to the hire and tenure of employment of certain employees,[10] thereby discouraging membership in or affiliation with the Union, has engaged in unfair labor practices. As part of its order the Board included offers of reinstatement and an award of back pay. Berkshire protests this finding and the order based upon it.

■ Berkshire maintains that the cause of the strike in 1936 was not its unfair labor practices but the desires of its employees for economic betterments. The Board recognized in its opinion that the latter was the goal of the strike. Employees may seek to obtain economic betterments either through the peaceful means of collective bargaining or, if such a course is prevented, through striking. This is implicit in the National Labor Relations Act which seeks to obviate the latter course by making peaceful settlements of labor disputes possible through the outlawing of unfair

---

[9] One foreman told the employees "they could sign it [the petition] if they wanted to work; if they didn't want to work there, don't sign the petition."

[10] The complaint was dismissed as to 282 employees for lack of evidence.

labor practices inimical to collective bargaining.[11] It takes but a casual review of the unfair labor practices indulged in by Berkshire to show that the attainment of economic betterments by its employees through collective bargaining was frustrated by those unfair labor practices.

Berkshire maintains that three employees[12] for whom the Board ordered reinstatement and back pay were not discriminatorily discharged. One, it says, was dismissed because he was a "dissatisfied and disgruntled worker"; the other two because of infractions of plant rules. An examination of the circumstances preceding the dismissal of these employees clearly admits of at least an inference that their discharge was discriminatory.[13]

Berkshire contends that only those employees who, before they went on strike, gave notice of their intended absence from work pursuant to provisions in their employment contracts, should be offered reinstatement. We do not think that those contract provisions were intended to apply to absence from work due to a strike.

The Board ordered Berkshire to offer reinstatement to and to make whole those employees who went on strike in 1936, apparently in addition to those who were specifically named in its order. Berkshire complains that as to these unnamed employees it has had neither notice nor a hearing.[14] The complaint and proceeding put Berkshire on notice, of course, that the issues of reinstatement and back pay would arise, even though the complaint failed to name all the employees in whose favor an order of reinstatement and back pay would run. See Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 1939, 107 F.2d 472, 478, 479, modified as to another point, 1940, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; Stewart Die Casting Corporation v. National Labor Relations Board, 7 Cir., 1940, 114 F.2d 849, 856, certiorari denied, 1941, 312 U.S. 680, 61 S.

Ct. 449, 85 L.Ed. 1119. We do not think that this portion of the Board's order is invalid if Berkshire will have an opportunity to present any defense it may have, not already determined, against reinstatement and back pay to any given employee. Such opportunity should be given to Berkshire at the appropriate time.

Berkshire urges that it should not be compelled to reinstate those people who, it is said, were guilty of crimes of violence during the strike and a few employees who were shown to have lied in connection with their employment and thereby revealed themselves unfit to be employed by the Company. Cf. National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. It appears, however, that the Board's order has made a careful discrimination among a group that got into trouble with the law during those violent days. It has culled out from the list for whom reinstatement is ordered the more serious offenders. Since no exact data was volunteered it has used the punishment inflicted in the local court as the criterion of the seriousness. With the lack of other data this seems to us an entirely reasonable course. Those who were left on the list to be reinstated were evidently treated as minor offenders. We think the order of their reinstatement was clearly within the law as stated by this Court. Republic Steel Corp. v. National Labor Relations Board, supra. Also untenable, and answered in the Republic Steel Corp. case, is Berkshire's contention that the violence and lawless conduct which occurred during the strike required a dismissal of the entire proceeding.

With regard to the back pay order a somewhat different question is presented. Berkshire urges that it is inequitable to order it to pay full wages to these employees for all the years which this litigation has been pending. It is mistaken, of

---

11 See § 1, 29 U.S.C.A. § 151.

12 Eugene Moyer; Frank Enck; Ernest Epting.

13 Thus Moyer the day before his discharge attended the meeting of the Union at which it was decided to call a strike and participated in the discussion, describing his earnings. Enck and Epting collected money during working hours before Christmas in 1936 to present to an employee who was on strike. Although this might have violated a plant rule, upon being discharged

several days later, their foreman told them the cause of the discharge was for collecting money for a striker, indicating a furtherance on their part of the cause of the strike.

14 It is to be noted that the complaint alleged that Berkshire refused to reinstate 303 named employees. As indicated the complaint was dismissed as to 282 for lack of evidence. The remaining 21 employees named testified in this proceeding.

course, in its conclusion that the gross amount of wages which would have been earned is the amount which it is necessarily out of pocket. The gross amount will be reduced by the amount actually earned by the employee on a well established formula administered by the Board and the question may come again into this Court if and when further proceedings for enforcement become necessary. On the lapse of time point there is a problem. This case has hung fire for a long time. However, it is to the Board that the law gives the discretion of the back pay award, § 10(c), 29 U.S.C.A. § 160(c), not for the actual benefit of the employee concerned, but as a matter of public concern in the effectuation of the policies of the Act. It is a public right, not a private claim, which is enforced. Virginia Electric & Power Co. v. National Labor Relations Board, 1943, 319 U.S. 533, 543, 63 S.Ct. 1214, 87 L. Ed. 1568; National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 1942, 128 F. 2d 188. We cannot say that the Board improperly exercised its "wide discretion" as defined by the Act. See Virginia Electric & Power Co. v. National Labor Relations Board, supra. While the case has not moved with the celerity which is desirable in carrying out the purpose of the Act, the delay from step to step has not been shockingly long, especially in view of the multitude of the questions that have been presented and the size of the record that has been built up. Delays in litigation, attributable to such causes are not a ground for denying the appropriate relief when the final determination of the case comes. We think that is equally true of an award given in recognition of a public right as one given to enforce a private claim, especially in such a case as this, where the evidence of unfair labor practices is so strong.

The order of the Board will be enforced then, with two modifications. 1. Subdivisions (b), (e) and (f) of paragraph 2 of the order are to include a provision that Berkshire may have a further hearing to show why it should not offer reinstatement and award back pay to any employee coming within the order, except as to issues already determined in this proceeding and except as to employees listed in appendices B and C. 2. Subdivision (g) of paragraph 2 is to be amended by inserting after "* * * Berkshire Division thereof," the following, "or to organize or join any union they choose, whether or not it is affiliated with a national union," in accordance with the opinion of this Court in National Labor Relations Board v. Baldwin Locomotive Works, 3 Cir., 1942, 128 F.2d 39, 51.