**R. R. DONNELLEY & SONS CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 8915.

Circuit Court of Appeals, Seventh Circuit.

June 12, 1946.

Rehearing Denied Aug. 12, 1946.

BRIGGLE, District Judge, dissenting.

Ernest S. Ballard and T. C. Kammholz, both of Chicago, Ill. (Pope & Ballard, of Chicago, Ill., of counsel), for petitioner.

Alvin J. Rockwell, Malcolm F. Halliday, A. Norman Somers, David A. Morse, General Counsel, Morris P. Glushien, Marcel Mallet-Prevost, and Platonia Kaldes, all of Washington, D. C., for National Labor Relations Board.

Before MAJOR and MINTON, Circuit Judges, and BRIGGLE, District Judge.

MINTON, Circuit Judge.

The National Labor Relations Board, the respondent herein, found that the petitioner had violated Sections 8(1) and 8(3) of the National Labor Relations Act.[1] The respondent entered a cease and desist order against the petitioner for its violation of Section 8(1) and ordered petitioner to take certain affirmative action which the Board found would effectuate the policies of the Act concerning the violation of Section 8(3). Petitioner brought this proceeding to review this order of the respondent. The Board has asked that its order be enforced. The only question presented is whether or not there is substantial evidence to support the findings of the Board.

The petitioner is one of the largest establishments of its kind in the United States. It has been in existence for over forty years, and now has in its employ approximately 4,600 people working in three shifts. From 1903 to 1933, it maintained a consistent, persistent, vigorous opposition to labor unions. During this period, before an employee was hired, he was questioned as to his membership in or affiliation with any union. If found to be a member of a union, or affiliated with it, such person was not employed for that reason. If he were employed, and afterwards became a member of a union or active in the affairs of unions, he was discharged. The petitioner resorted freely to the use of what is commonly known as the "yellow-dog" contract. The petitioner conducted what it was pleased to call a "non-union closed shop" and let it be known not only to its employees but to the trade generally that it maintained a non-union closed shop and that it was opposed to unionization. This policy continued until 1933 when the petitioner signed the Code and operated under the National Industrial Recovery Act. 48 Stat. 195. The petitioner let it be known to its employees that it had not changed its attitude toward unions and that it was only complying with the law.

Petitioner was opposed to the passage of the National Labor Relations Act and said so. After the Act was passed and declared constitutional by the Supreme Court in the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, the petitioner, through the medium of its shop paper which was sent to all of its employees into their homes, represented the Act to its employees as a rather innocuous bit of legislation and of scant utility to the employees.

With this long, consistent, persistent background of antagonism to unions, the petitioner continued on every occasion to argue and plead with its employees against unionization and to propagandize in favor of its so-called non-union closed shop policy. Such conduct was clearly interference with the rights of the employees to organize and choose their own agent for purposes of collective bargaining as provided in Section 7 of the Act.

The petitioner says that such conduct

---

[1] 29 U.S.C.A. §§ 151–166.

based upon argument and presentation of its views against unionization, if it is interference with the organization rights of the employees under Section 7, is justified under the right of free speech guaranteed by the First Amendment to the United States Constitution and National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 87 L.Ed. 348, and Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 340.

Admitting without deciding that mere talk and argument by an employer, no matter how persistent, cannot be limited by the National Labor Relations Act, in the light of the First Amendment to the Constitution, we think the petitioner went far beyond mere talk and argument with its employees. It assembled its foremen and sent them out among its employees to preach opposition to unionization, and its superintendent and department managers did likewise. The employees were threatened that if the union came in to petitioner's shop, the employees would lose their annuities, recreation and gymnasium facilities around the place, and no bonus would be paid them.[2] The employees were further told by superintendent Busby that if petitioner's shop became unionized, petitioner could no longer guarantee three days' work a week and when the press was shut down, the employees would be laid off.[3] President Littell stated to the petitioner's employees that if petitioner's plant became unionized, the union would demand a closed shop, petitioner would not grant a closed shop, a strike would be called, and Superintendent Busby said that if the employees struck, they would be through at the petitioner's place forever.[4] Depart-

---

[2] Testimony of foreman Maxwell:
"Q. Mr. Maxwell, at these foremen's meetings at which the Donnelley benefits were pointed out to the foremen, were there any statements made by supervisory officials that in the event the union came in, the employees would lose the benefits which they then enjoyed, such as old age pensions and dismissal wages? A. He said that we should realize that and make the men realize if the union came in there that they would lose their annuities. That is about all I remember about that.
"Q. Who said that? A. Mr. Busby.
"Q. Do you recall any other benefits other than annuities that were mentioned in that connection? A. Except recreation, gymnasium, and things like that, around the place.
"Q. Was the statement made that they might lose those benefits also? A. Yes, sir."

Testimony of Thomas E. Donnelley:
"Q. Well, calling your attention to the next paragraph in this letter it states that if the plant becomes unionized, you would have to discontinue the bonus system? A. Yes, sir.
"Q. Is that what you wanted your employees to believe? A. Yes, sir.
"Q. And that was what you wanted the employees to believe in 1929, also, wasn't it? A. That is right.
"Q. And that is still the policy of the company? A. It is still the policy of the company, yes."

[3] Testimony of Walter Zad, employee:
"A. He (Supt. Busby) came to my press, looked at the table and my job and commented and then he came to the point,—he said: 'I understand you are in favor of the union.' I said: 'I am.' He told me, he said, 'I am not going to tell you to join a union or not; you know that under union conditions Donnelley's cannot guarantee you three days a week and that we would have to raise our prices 20 per cent and when your press was down, that is when there wasn't a form on the press you would be laid off.'"

Testimony of Fred Miller, employee:
"Q. What do you mean by that? A. Well, there was a job that was printed on one side only and there was an offset on one corner due to a slippage of the delivery sheet at the press which had to be cleaned, due to making a schedule at the bindery, a time schedule, and Mr. Busby walked up at that time and looked over my way and says, 'You know, Miller, if this were a union shop you wouldn't have to fool around with that sort of thing at all; you would be home.' He said, 'You get the inference of that remark, don't you?' Well, naturally, I did.
"Q. Well, what inference did you draw? A. If it were a union shop I would be home because my press wasn't running and no press was running and, therefore, we would be home until it ran again.
"Q. Did you understand Mr. Busby to mean that if the plant became unionized you would have considerable layoff periods? A. Yes, we did.
"Q. That you would have less work than you had prior to the time of such unionization? A. Yes, we understood that."

[4] Testimony of Edward A. Krippner, employee:

ment manager Flexman told employee Harry Caldwell that because he had signed a union card, he would not in the future receive the responsibility he deserved and that the company appreciated and rewarded loyalty in their employees.[5] Department manager Flexman further said to Caldwell that foreman West, because he was known to be active in union affairs, would have to be relieved as foreman and put back on the bench as an ordinary employee.[6] Caldwell was further told by Flexman that he was marked as a union man and that he could redeem himself by resigning his position as chairman in the union.[7] Manager Flexman told foreman West that if he wanted to join the union, to go ahead and join, but to "get the hell out of" petitioner's shop, and he slammed the door and went out.[8] Superintendent Busby also told employee L. D. Maxwell that Mr. Donnelley, chairman of petitioner's board, had pledged or made a statement to the effect that he would spend 80% of his entire fortune to prevent unions from getting in to Donnelley's.

■ This record is shot through with similar statements made after 1937 by the superintendent, managers, and department foremen of the petitioner. The statements which we have just detailed are not mere statements of the petitioner's arguments as to its anti-union attitude; they were threats and attempts to intimidate the employees if they joined the union. The petitioner maintained a vigilant surveillance of its employees' union activities and let it be known to its employees that they were being watched. Such constant surveillance was calculated to and did intimidate the employees. The petitioner cannot, in the light of this record, cloak itself in the raiment of the First Amendment to the Federal

"Q. Would it refresh your memory if I asked you with respect to the statements Mr. Busby made about strikes, whether he made a statement: 'Once you strike you are done here; you are fired?' Do you recall any statement similar to that? A. Yes, sir, before he made that statement, 'Once you walk out,' he said, 'Once you strike, once you walk out of here or strike you are done with this place forever. You are my baby no longer.'"

[5] Testimony of Harry Caldwell, employee.

"He (department manager Flexman) asked me to sit down and he started out by saying that he was surprised and hurt to hear that I had gone union on him, and I objected and said that I hadn't signed a card, I hadn't joined the union, I was still just a card signer and that I had simply been elected by the fellows in my department to represent their interests, and he said that nevertheless the publicity had made me a marked man and I would probably not in the future receive the responsibility that I deserved, and he said that he knew that I was well liked in the department and my action could very possibly influence others over to the union. He then said that the company appreciated and rewarded loyalty in their employees, and as an example he cited the case of Axel Anderson, who had recently been retired and he had received quite a sum of money from the company."

[6] Testimony of Harry Caldwell, employee:

"A. And I said that I had not had a confidential conversation with West since I had been transferred on days and that was on January 1st, and at that time he was on the fence just as the rest of us were, most of us in the department. Mr. Flexman said he had evidence to the contrary and because of that he was going to have to have him put back on the bench.

"Q. Put who? A. Walter West."

[7] Testimony of Harry Caldwell, employee:

"Q. In this conversation with Flexman upstairs, did I understand you to say that Flexman told you that you were marked as a union man because of the step you had taken, and that you would probably not be given the responsibility you deserved because of your action? A. That is right.

"Q. Now, do you recall whether or not he had anything further to say about your position or the step you had taken? A. Yes.

"Q. What was that? A. He said that I could help redeem myself by resigning my position as chairman."

[8] Testimony of Walter West:

"Q. Just tell us what it was, please. A. He (department manager Flexman) said, 'These guys are always talking about union. If they want to join the union, why don't they join it? Let them go ahead and join the union, go and work in a union shop, but get the hell out of here. We don't want them.' With that he threw down the papers and stormed out of the door, slammed the door, and out he went."

Constitution in order to justify and excuse its threats and intimidation. Thomas v. Collins, supra, 323 U.S. 537, 65 S.Ct. 315, 89 L.Ed. 430; National Labor Relations Board v. American Laundry Machinery Co., 2 Cir., 152 F.2d 400; Reliance Manufacturing Company v. National Labor Relations Board, 7 Cir., 143 F.2d 761, 763; National Labor Relations Board v. Sunbeam Electric Manufacturing Company, 7 Cir., 133 F.2d 856, 860.

■ Petitioner cannot be heard to say that it is not responsible for the acts of its foremen which it sent out on missions of anti-unionism because these foremen had a right themselves to say what they said and do the things they did since they were employees themselves. When the petitioner sent them out on missions of anti-unionism, the petitioner became responsible for what they said and did. The foremen were then speaking for their employer as its representatives, and the petitioner was liable for what they said and did within the scope or apparent scope of their authority. International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Company v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Fitzpatrick & Weller, Inc., 2 Cir., 138 F.2d 697, 698. The rank and file of petitioner's employees had a right to assume that the foremen spoke for the petitioner, especially in the light of petitioner's long standing antagonism to unions, and the petitioner's attitude as conveyed to them by their foremen was bound to be impressive, and when threatening and intimidating, it was of a coercive character not protected by the freedom of speech guaranteed by the First Amendment to the Constitution.

"* * * When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. * * *" Thomas v. Collins, supra, 323 U.S. at page 537, 65 S.Ct. at page 326, 89 L.Ed. 430.

■ We think there is substantial evidence in the record to support the findings of the Board that the petitioner violated Section 8(1) of the Act by interfering with and coercing its employees in their right to organize as guaranteed to them by Section 7(1) of the National Labor Relations Act. International Association of Machinists v. National Labor Relations Board, supra; National Labor Relations Board v. Sunbeam Electric Manufacturing Company, supra; National Labor Relations Board v. Schaefer-Hitchcock Company, 9 Cir., 131 F.2d 1004; National Labor Relations Board v. Reynolds Wire Co., 7 Cir., 121 F.2d 627; Valley Mould & Iron Corporation v. National Labor Relations Board, 7 Cir., 116 F.2d 760.

We now consider the finding that foreman West was discriminatorily demoted from foreman on the night shift to a rank and file position on the day shift in violation of Section 8(3) of the Act.

West had been employed by petitioner since 1934. He was a skilled, excellent workman who not only did his work intelligently, but he used his intelligence to devise an improved method of repairing press cylinders, for which he received the commendation of the president of the company and a check for $50. As foreman he understood his job and got the work out. During the time West was foreman, the production of his department increased by 50%. In the summer of 1942 West received a raise of fifteen cents an hour, with which he was not satisfied, and he asked to be sent back to the day shift and relieved as foreman. This petitioner declined to do and insisted that he remain on as foreman, which he accordingly did.

West signed up with the union and became active in this organization's efforts in petitioner's plant. Under the surveillance system operated by petitioner, it soon became fully informed as to West's connection with the union. After it had been publicly announced over the radio and in print that West was a member of the council of the union and there could be no doubt of his activities on behalf of the union, although he was a capable, efficient foreman, superintendent Busby and department manager Flexman said to West, "If the job gets too tough for you, just let us know, and we will relieve you." West had made no protest that the job was "too tough" for him, nor had any one of the officials of the company

so indicated. This incident occurred about the first of the year, 1943. About the same time, department manager Flexman in talking to West and employees Schutt, Dorn and Caldwell, gave evidence of the purpose of the petitioner to demote West because of his union activities.[9]

On April 1, 1945, an anonymous telephone call to manager Flexman reported that West had been seen smoking in the film storage room with employee Nazar. The smoking rule was observed very much in the breach thereof, and nothing was ever done to employee Nazar for his violation. The usual punishment meted out for such violation of the no-smoking rule was a week's suspension without pay. About a week after the West smoking incident, officials of the company began to accumulate proof that West had been seen smoking in the film room. On April 15, 1943, Chairman of the Board of Directors Donnelley, the Executive Vice-President Zimmerman, plant superintendent Busby and counsel for the petitioner all met in Zimmerman's office, and department manager Flexman reported to this imposing array of company officials and was instructed to demote West, which was accordingly done.

■ It was the National Labor Relations Board's duty to determine from these circumstances whether petitioner demoted West for violating the no-smoking rule, which petitioner had a perfect right to do, or whether he had been demoted because of his union activities as department manager Flexman had threatened, and the smoking incident was a pretext therefor. The Board found the latter. This was a reasonable inference to be drawn from the circumstances and it is supported by substantial evidence in the record. It was within the Board's province to draw such inferences. National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368.

The Board's finding that petitioner violated Section 8(3) of the Act must be and is sustained. National Labor Relations Board v. Polson Logging Company, 9 Cir., 136 F.2d 314; National Labor Relations Board v. William Davies Company, 7 Cir., 135 F.2d 179.

On the oral argument, counsel for petitioner contended that since it had a valid reason for demoting West, the Board could not infer from the other circumstances in the case that he was demoted because of his union activities, citing National Labor Relations Board v. William Davies Company, supra; National Labor Relations Board v. Automotive Maintenance Machinery Co., 7 Cir., 116 F.2d 350; Martel Mills Corp. v. National Labor Relations Board, 4 Cir., 114

---

[9] Testimony of Walter West:

"Q. * * * Now, in December did Mr. Flexman say anything to you with respect to Busby's attitude toward you, do you recall? A. We were discussing the men in the department who were with the union, the amount—he asked if I had any idea how many were in, and I said I had no idea how many were in; that evidently there were quite a few, but how many I didn't know, and he said, 'Well,' he said, 'Of course, Mr. Busby knows you are all right. He says you are a pretty good workman, and everything, but he thinks you have got too many union friends. You are keeping bad company.'

"Q. Now, up to that time what had been your relationship with Mr. Flexman and Mr. Busby; had it been friendly or unfriendly? A. Very friendly.

"Q. Did you notice a change following that conversation? A. It wasn't very long after that that I felt a feeling of hostility, an attitude of hostility

"Q. On the part of whom? A. Mr. Flexman."

Testimony of Fred Dorn, employee:

"A. * * * I says, 'Are you sure he (West) belongs to the union?' and he (Flexman) said, 'We are positive he does.' And he says, 'I am going to have him taken off the night shift and put him back on days.' He says, 'I don't know how I am going to do it, but I will have to do it some way.' He also stated then that Wally is creating an unhealthy atmosphere in the department, and that he is going to get rid of him. He said he would just have to wait until the opportunity presents itself. * * *"

Testimony of Alfred Schutt, employee:

"A. * * * (Flexman) went on to say that he was going to have to get rid of Wally (West), and that Wally was a good pusher, and he got the work out all right, but that he couldn't have all that union agitation going on around there, and that the next foreman would be a man of character and a man that all the fellows would look up to * * *."

F.2d 624; National Labor Relations Board v. Thompson Products Company, 6 Cir., 97 F.2d 13. None of these cases support the proposition advanced by the petitioner. These cases only hold that the inference cannot be lightly drawn or drawn without the foundation of substantial evidence. As we held, for instance, in National Labor Relations Board v. William Davies Company, supra, the inference could not be drawn by the Board for mere membership in the union alone, there being present other reasons for the action of the company.

We hold that the findings of the Board are sustained by substantial evidence, and the petition to set aside the order of the Board is denied and the request of the Board that the order be enforced is granted.

BRIGGLE, District Judge, dissents from the decision of the Court in this cause.