## NATIONAL LABOR RELATIONS BOARD
### v. SIFERS.
### No. 3671.

United States Court of Appeals
Tenth Circuit.

Nov. 29, 1948.

Herman J. De Koven, of Chicago, Ill. (David P. Findling and Ruth Weyand, both of Washington, D. C., and Samuel M. Kaynard, of New York City, on the brief), for petitioner.

Howard M. Immel, of Iola, Kan. (Frederick G. Apt and Mitchell H. Bushey, both of Iola, Kan., on the brief), for respondent.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This case comes to us on the petition of the National Labor Relations Board seeking enforcement of its order against the respondent Earl I. Sifers, an individual d/b/a Sifers Candy Company. The order arose out of proceedings before the Board charging the employer with unfair labor practices in violation of Section 8(1), (3), and (5) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 158 (1, 3,-5), upon findings by the Board, after lengthy hearings, that such charges had been sustained. In general, the Board found that the employer had violated the employees' rights in that he had interfered with their right to freely organize a union, had discriminately shut down his plant and locked out his employees in order to interfere with their right to organize, and had, thereafter, unlawfully discriminated against union employees in rehiring employees when the plant was reopened.

After the usual desist and post notice order, the Board further ordered the employer to cease and desist from refusing to bargain collectively with the union, to offer to the employees, listed in Appendix B of the order, reinstatement, without prejudice, to seniority rights, to make whole each of the employees listed in Appendix B for any loss of pay from April 23, 1946, to date of the offer to reinstate, and make whole the employees listed in Appendix A, by reason of respondent's discrimination.

The evidence tending to support the Board's findings may be summarized briefly, as follows.

Since January, 1943, respondent has been engaged in the manufacture of chocolate syrup at Iola, Kansas, and at the time of this controversy was employing approximately fifty workers. In 1945, there were rumors about the plant that a union was being formed. Respondent at that time stated that he did not want to hire anyone who had been a union member and that he would close his plant before he would permit it to be organized. On or about April 17, 1946, the employees held a meeting in the plant to discuss how they might obtain a wage increase. They asked Guy Ashwell, the plant production superintendent, to convey their demands for such increase to respondent. He did so and was instructed to tell the employees that respondent had no comment to make at that time. This message was conveyed to the employees. They then decided to give the respondent until April 20 to make a decision in regard to their request for a wage increase before undertaking organization activities. On April 18, Conner, an employee, informed Ashwell that the employees were considering organizing a union and requested permission to talk to some of the employees on the second shift. When no reply had been received from respondent by April 20, with regard to a wage increase, union activities were undertaken. A meeting was called for the first shift at 3 o'clock on the afternoon of April 22, 1946. At this meeting practically all the employees on the first shift signed union cards. A meeting by the second shift could not be held that night because the organizer was leaving town. About 4 P.M. employee Conner asked Ashwell for permission to notify the employees of the second shift of the postponement of the meeting. Ashwell inquired as to the action taken by the employees of the first shift and was informed that all but one or two had joined the union. Ashwell shortly thereafter transmitted to respondent the information that he had received from Conner and that the second shift would meet for a union organization meeting the next day. In the same afternoon, respondent questioned various employees as to the identity of those who had joined the union and stated to a number of employees that he would shut the plant down until he learned who was joining the union. About

six o'clock on that day, the employees **of** the second shift who were then at work were informed by Ashwell that the plant would be shut down the next day, Tuesday, April 23, because of a shortage of malt syrup.

Letters were sent to certain employees advising them that because of the shortage of raw material it was necessary to curtail operations; that there was no further need for their services and "due to uncertainty of the time when we will resume operations" a check was enclosed for Monday's work.

At 7 P.M. on the day the plant was closed down, Ashwell made a special trip to Conner's home to inform him that the plant had been closed down. Some of the other employees learned late that evening that the plant had been closed down. Others did not learn of it until the next morning when they reported for work. On April 23, the plant was closed and notices were posted on the doors to prevent employees from entering. A member of the Iola City Police kept the plant under special surveillance during the day, although no disturbances occurred. On April 26, the plant was reopened with 23 of the former employees working on a single shift. Of this number 19 had not joined the union, while 24 of the 26 of the employees not recalled had joined the union. In May and July, respondent granted increases in wages to the recalled employees. Respondent personally prepared a list of the employees to be recalled and handed it to Ashwell, who, in turn, notified the employees on the list to return to work.

On or about August 12, respondent resumed two shift operations and at that time advertised in the papers for employees. Twenty-six new employees and one old employee were given employment. The one old employee had signed a union card, but three other former employees who had signed union cards were refused employment.

There was testimony by former employees that on former occasions when the plant was closed because of material shortages, they had always been notified of such contemplated closing before leaving work; that they had never received a letter such as was sent out when the plant closed on the twenty-second and never before had respondent advertised for employees when the plant was reopened. Most of the employees who did not seek reemployment testified that when the ad appeared in the paper they did not seek reemployment because they had taken the letter of April 22 as a final dismissal.

There was also testimony of various employees that just before the plant closed on the twenty-second they had inquired of the superintendent as to the amount of raw materials on hand and had been told that work would continue and that a carload of syrup was due the next day. It is undisputed that the syrup did arrive on April 24. There was also evidence that on the afternoon of the twenty-second, before the day shift left, respondent asked various employees what they knew about a union being organized and that he stated that he would shut the plant down until he found out about it.

In a conference with the employer and his attorney, an official of the union requested that all the employees be reinstated, but this request was refused. The official presented union applications which had been signed by 28 of the 49 employees who had been working when the plant closed, but the employer refused to recognize the union as a bargaining agent on the ground that it did not represent a majority of the workers then employed.

■ There is, in the record, credible evidence which tends to contradict the evidence set out above, but since our inquiry is limited to ascertaining whether the findings of the Board upon which its order is based are sustained by substantial evidence, no useful purposes would be served by setting out such evidence. We have confined ourselves to a recital of the evidence which, in our opinion, tends to support the findings of the Board. The resolution of any conflict in the evidence was for the Board and it is our conclusion that its findings are amply sustained by the record.

■ As pointed out, on April 23, the day of the shutdown, 28 of the respondent's employees had joined the union. On April

26, respondent recalled 23 employees, 19 of whom were not members of the union. Of the 26 employees who were not recalled, 24 were members of the union. Without resorting to percentages and mathematical calculations, and viewing the disparity between the non-union and union members recalled from a common sense point of view and in conjunction with the other evidence, it is evident that the disproportionate hiring of non-union workers was evidence of discrimination. National Labor Relations Board v. Chattanooga Bakery, 6 Cir., 127 F.2d 201, 204; National Labor Relations Board v. Sandy Hill Iron & Brass Works, 2 Cir., 165 F.2d 660, 663.

When, on August 12, respondent resumed operating his plant in two shifts, he advertised in the local papers for applicants and hired 26 employees, who were not former employees. This constituted a deviation from the usual method pursued in recalling employees when the plant had been shut down. While respondent contends that he did not know which employees had joined the union on April 26, when he compiled the list of names of the employees to be recalled after the shutdown, there is evidence that shows that he had seen the applications of members of the union on May 14, and with such knowledge he employed 26 persons not members of his former employment.

■ The manner in which the plant was shut down on different occasions also supports the conclusion of the Board. As pointed out, there is evidence that on former occasions the employees were notified when they left the plant at the close of their shift, but this was not done in this case. Some did not ascertain that the plant had been shut down until they reported for work the next day. So also, the unilateral wage increase to his reinstated employees, coming after respondent's refusal to give an increase to former employees, tends to support the conclusions of the Board.

■ Respondent asserts that he was not obligated to recognize the union as the exclusive bargaining representative of his employees because 24 of the 28 members of the union were no longer his employees for the reason that they had not been reinstated after the plant reopened. However, since they were ousted from their jobs because of unfair labor practices, they remained employees for the purpose of determining majority representation by the Union and collective bargaining obligations of the respondent. National Labor Relations Board v. Cape County Milling Co., 8 Cir., 140 F.2d 543, 546, 152 A.L.R. 144.

Taken in its entirety the evidence in the record is sufficient to sustain the findings of the Board and the order of the Board will therefore be enforced.