## NATIONAL LABOR RELATIONS BOARD v. GOODYEAR FOOTWEAR CORP.

### No. 10229.

United States Court of Appeals
Seventh Circuit.

Jan. 17, 1951.

Kerner, Circuit Judge, dissented.

David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Julius G. Serot, Fannie

M. Boyls, Attorneys, National Labor Relations Board, Washington, D. C., for petitioner.

William C. Waring, Jr., Providence, R. I., Morris I. Leibman, Thomas P. O'Boyle, Richard H. Prins, Chicago, Ill. (Carney, Crowell & Leibman, Chicago, Ill., of counsel), for respondent Goodyear Footwear Corp.

Before KERNER, DUFFY and FINNEGAN, Circuit Judges.

FINNEGAN, Circuit Judge.

In this proceeding National Labor Relations Board seeks a decree of this court ordering the enforcement of an order of said Board, issued on November 24, 1948, directing respondent, Goodyear Footwear Corporation, its officers, agents, successors and assigns to comply therewith.

It appears that respondent is a Delaware Corporation having its principal office at Providence, Rhode Island. It is engaged in the manufacture, sale and distribution of rubber footwear. Early in 1946 the respondent had a survey made of the midwest industrial area, and decided to attempt to locate a plant at Clinton, Illinois.

At that time Clinton had a population of approximately 6300 people, and contained only three small factories each of which employed less than 50 persons. The plans of the respondent called for the establishment of a manufacturing plant employing between 500 and 600 persons.

In March 1946, the citizens of Clinton formed the Clinton Community Association for the purpose of raising funds, purchasing land and erecting a building suitable for respondent's use. The Association made an agreement with respondent under the terms of which the Association agreed to obtain a tract of land outside the city of Clinton, containing 48 acres, and to erect thereon a factory, 380 by 180 feet in size, together with a boiler house, 40 by 30 feet, and a cement house, 40 by 26 feet. Respondent agreed to purchase the completed structures within thirty days after completion at a price equal to the total actual cost of construction. Seven hundred and nine persons interested in the Clinton Community Association advanced $219,000 to finance the building program. Their investment was secured by bonds, one-tenth of which were to be redeemed each year.

Construction was begun in the spring of 1946, but was hampered by lack of materials and incessant rains. Owing to the difficulties encountered, the main structure was put up in what amounted to reverse order. That is, the cement floor was put in first, followed by walls, steel work and roof in that order. This course of construction was followed because the respondent planned to start a training program. It was intended to begin the program in June 1946, but it was delayed by the difficulties encountered.

By September 1946, the cement floor had been poured and hardened. The respondent, through its officers, anxious to begin the training program, caused temporary wooden sheds to be erected on a portion of the cement floor.

Finally, on October 15, 1946, the training program was begun in such temporary wooden sheds. Some 47 trainees were procured by respondent.

The temporary shed used for the training program was, as we have said, constructed of wood and tar paper. It was 40 by 90 feet. It was at least 100 yards from the nearest highway and the only approach to it consisted of two ruts through the mud. It contained no heating facilities. An Illinois Central locomotive was borrowed and used to furnish steam. It was so cold at times that trainees were unable to work a full day. There were no toilet facilities in the shed, the nearest conveniences being located about a block away along the railroad track. Drinking water had to be carried in coolers from a shack of the builders about 200 yards distant. Rain seeped through the tar paper roof, the floor was frequently flooded. Electrical current for lighting and power was provided by temporary wires strung along the concrete floor.

The plant was to have been substantially completed with the roof in place by Novem-

ber 1946. At that time only the concrete floor had been completed. The permanent structure could not be completed until the temporary sheds were removed because the roofing cranes could not be moved through the surrounding ground, as originally intended, because of the mud. It therefore became necessary to operate them from the concrete floor. As a consequence there was danger that the beams might slip from the cranes and crush the temporary wooden training quarters.

In mid-November respondent decided, because of these conditions, to terminate the training program until the permanent structure could be erected.

On November 20, 1946, respondent received a letter from the Field Representative of the United Rubber, Cork, Linoleum and Plastic Workers of America, C.I.O. which advised "that the majority of the production and maintenance employees in the Clinton plant" had designated it as their exclusive representative for the purpose of collective bargaining. The Union asked for the institution of negotiations in respect to wages and conditions of employment. The letter advised respondent that if it failed or refused to comply with the Union's request, proceedings would be begun before the National Labor Relations Board.

Respondent replied that the plant in Clinton was in construction and not yet under roof; that present workers were employed on a training basis; and that it would be many months before the plant could get into production.

On December 4, 1946, the respondent closed its training experiment. It gave each trainee, in addition to regular pay, a bonus equivalent to two weeks pay. The training program had been in progress for less than eight weeks, and no saleable finished product was ever produced.

On December 5, 1946, the day after the training experiment was abandoned, the respondent caused to be published in the Clinton Journal an advertisement entitled "Our Policy." This advertisement will be considered more in detail later on in this opinion.

During the month of December 1946, the trainees themselves drew up and signed a petition which declared their gratitude and friendliness to the respondent corporation and expressed the hope that they would be reemployed when its plant reopened. On December 11, 1946, 29 of the trainees (a majority in number) addressed a letter to the field representative of the Union in which they cancelled their membership applications and notified the Union that it was no longer their representative. Again, on December 16, 1946, 32 of the former trainees notified the Chicago Regional Office of the Labor Relations Board that they did not wish to be considered members of the Union involved, had never paid dues thereto, and had requested the return of their applications.

These letters, according to the trial examiner's findings, were not suggested, composed, drafted, executed or published by the respondent company, as suggested by the Board, but were in fact the spontaneous actions of the persons signing them.

On July 1, 1947, the plant, although not yet completed, was opened for limited operation. At that time every trainee who was in respondent's employ, and who desired to work, except two, was either put to work immediately or informed that they would be given work as soon as it was available.

It is agreed that the action of respondent in not rehiring the two excepted was justified for reasons not connected with or material to the present controversy.

In the meantime, upon an amended charge by the Union, the National Labor Relations Board issued its complaint against respondent, charging that it had engaged in and was engaging in unfair labor practices affecting commerce within the meaning of Sections 8(1) and (3) and Sections 2, 6 and 7 of the National Labor Relations Act, 29 U.S.C.A. §§ 152, 156, 157, 158 (1, 3).

With respect to unfair labor practices, the complaint alleged, in substance, that the respondent, (1) since October 1946, has engaged in a continuous course of conduct of interfering with, restraining, and coerc-

ing its employees in the exercise of the rights guaranteed by the Act by persuading, warning, threatening, and intimidating its employees to resign from the Union, to refrain from joining the Union, and to refrain from engaging in legitimate concerted activities; and (2) on or about December 4, 1946, for the purpose of discouraging membership in the Union or any other concerted activity, locked out and discharged, and thereafter refused to reinstate, all the persons then employed by the respondent at its Clinton, Illinois, plant.

Hearings on the complaint were had, and at the conclusion thereof the Board's trial examiner entered his findings and conclusions on the facts and the law, and recommended that the complaint be dismissed in its entirety.

Upon exceptions filed, the Board reviewed the proceedings before the trial examiner and stated: "The Board has reviewed the rulings of the Trial Examiner at the hearing and finds no prejudicial error was committed. The rulings are hereby affirmed. The Board has considered the intermediate report, the exceptions and the briefs and the entire record in the case, and hereby adopts the findings and conclusions of the Trial Examiner only to the extent that they are consistent with the findings, conclusions and order hereinafter set forth."

The Board, however, in its decision and order reversed the Trial Examiner and directed respondent to cease and desist from the unfair labor practices found and from interfering with, restraining, or coercing its employees in the exercise of their rights under Section 7 of the Act. It ordered respondent to offer reinstatement and back pay to all but three of the former employees, to the three exempted it was to offer back pay. Respondent was likewise directed to post appropriate notices. Back pay was ordered abated between the date of Trial Examiner's Report, August 27, 1947, and the issuance of the Board's order, November 11, 1948.

As we have pointed out, two charges were made against respondent:

1st—That by persuading, threatening and intimidating its employees to resign from the Union it restrained and coerced them in the exercise of rights given them by the National Labor Relations Act; Sec. 8(1) N.L.R. Act, 29 U.S.C.A. § 158(1), and

2nd—That on December 4, 1946, it locked out and discharged and thereafter refused to reinstate all its employees at the Clinton, Illinois, plant. Sec. 8(3) N.L.R. Act, 29 U.S.C.A. § 158(3).

■ I. As we stated in N.L.R.B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, at page 690, in discussing alleged wrongful discharges: "The Board argues the discriminatory nature of these discharges as though the burden was upon respondent to exonerate itself of the charges made against it. The burden, however, was upon the Board to prove affirmatively and by substantial evidence that (naming persons) were discharged because of union membership and activities and for the purpose of discouraging membership in the union."

■ In the case at bar we can find no substantial evidence that the respondent persuaded, threatened, or intimidated any of its trainees so that they would resign from the Union. The conclusion of the Board that the trainees were restrained or coerced in the exercise of rights given them by the Act, rests merely on inference and is directly opposed to the finding of the Trial Examiner.

As a matter of fact, the record is clear that when the respondent's plant was nearer completion, on July 1, 1947, and operations of limited character were resumed all the trainees who had been engaged on December 4, 1946, with the exception of two, were rehired and actually put to work at once or promised employment as soon as occasion therefor arose. The Trial Examiner found and the Board agreed that respondent, for reasons not relevant in this proceeding, was justified in not rehiring the two excluded trainees.

The record further discloses that the last hearing before the Trial Examiner was held on July 22, 1947. This was nearly

three weeks after respondent had reopened its Clinton plant for limited operation. There was, therefore, ample time to produce evidence, if any there was, as to the deprivation of any person's rights under the National Labor Relations Act.

In our narration of the facts which form the background of this proceeding, we mentioned certain letters forwarded by trainees to the complaining union and to the regional office of the Board. The contention was made by counsel for the Board that respondent was responsible for the drafting and publication of such letters. The Trial Examiner found against the contention, and the Board apparently adopts his finding.

Finally, we come to the advertisement printed in the Clinton Journal on December 5, 1947, and denominated "Our Policy." With respect to this, the Trial Examiner said in his report:

"* * * Under the Act, mere words ascribable to an employer do not constitute unlawful interference with the legal rights of the employees unless the words amount either to an actual threat of economic punishment for engaging in collective activities, or, when interpreted in the light of other proven facts, to an implied threat of the same character; hence the discussion of facts and arguments, or the expression of opinions, preferences, or dislikes on the subject of labor relations, do not violate the Act. The advertisement, standing alone, is not sufficient basis for finding a violation of the Act since the advertisement does not contain any coercive matter. An employer may, as here, express opinions 'as to labor unions or as to anything else, so long as his expressions do not constitute or contribute to acts or threats of discrimination, coercion, or intimidation in denial of his employees' free and untrammeled exercise of their rights as guaranteed by the Act.' (Budd Mfg. Co. v. N.L.R.B., [3 Cir.,] 142 F.2d 922-926.)

"Under the circumstances of this case, the undersigned finds that the statements are thus protected by the constitutional guarantee of free speech. Nor are the statements coercive when evaluated in the context in which they were published. Accordingly, the undersigned finds that nothing contained in the advertisement is violative of the Act."

The Board finds contrary to the Trial Examiner that certain statements appearing in "Our Policy" were violative of section 8(1) of the Act. It altogether fails to note that the amendatory Act of June 23, 1947, which went into effect on August 22, 1947, *five days before the Trial Examiner's Report was issued, and more than a year prior to its own decision and order in this cause,* provides, in sec. 8(c) thereof 29 U.S.C.A. § 158(c) : "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

II. On the second charge, that respondent was guilty of a lockout, the Board after stating that it disagreed with the findings and conclusions of the Trial Examiner on the charge says: "The uncorroborated testimony of Jack Baker, the respondent's president, that because of these conditions (climatic and physical) it was decided 'about the middle of November,' which was a few days prior to the Union's request for recognition, to give the employees two weeks notice and close the plant is not a convincing explanation."

In other words the Board in its decision, starts out by assuming that the respondent company has the burden of disproving the charge. In the Board's opinion, any evidence it offers in denial must be corroborated. The law, of course, is otherwise. The burden was on the Board to prove the charge made by substantial evidence. N.L.R.B. v. Reynolds Co., 7 Cir., 162 F.2d 680.

From the premise, false as a matter of law, the Board's decision proceeds: "Admittedly the respondent did not actually close the plant until after it had learned of the organizing activity." It then notes

that respondent did not give its employees notice of its intent to suspend operations.

Here the Board is guilty of a logical fallacy. It argues that because its training school was closed after the respondent was informed of the effort to organize, it must have been closed because of such attempts.

This record is replete with evidence that economic, physical and climatic conditions practically forced the abandonment of the training plan of respondent.

On the other hand when we consider all the evidence in the case, and the photographic exhibits of respondent showing the condition of the training school plant in November 1946 and January 1947, we are forced to the conclusion that the Trial Examiner properly found that there was no credible evidence that the respondent closed its plant on December 4, 1946 for the reasons alleged in the complaint. As he put it: "The undersigned is convinced, and finds, that the respondent closed the plant on December 6, 1946 (sic.) for economic reasons and not for the reasons alleged in the complaint. The composite background of the climatic and other conditions that existed at the time of the plant's closing clearly reveals that it was absolutely impossible for the respondent to keep the plant in operation."

The findings of the Board which differ from those of the Trial Examiner, and upon which it predicates its conclusion that respondent is guilty of the charges made, are clearly erroneous. They are not based upon or supported by the substantial evidence in this record.

The prayer of the Board, that its decision be enforced by order of this court, is denied.

KERNER, Circuit Judge (dissenting).

It was respondent's theory that it closed its plant for economic reasons, but the Board found that respondent closed its plant and laid off its employees to discourage union activity and that thereby respondent discriminated against its employees within the meaning of § 8(3), 29 U.S.C.A. § 158(3), and in violation of § 8(1) and (3) of the Act had engaged in a course of conduct whereby it had interfered with, restrained and coerced its employees in the exercise of the rights guaranteed them by § 7 of the Act. These, of course, were factual findings and respondent seeks to override them. The sole question is whether there is sufficient evidence to support the findings.

It is elementary that if the findings of the Board are supported by sufficient evidence on the record as a whole, they are conclusive, 29 U.S.C.A. § 160(e). This court has repeatedly held that an employer's statement calculated to coerce employees in the exercise of their rights under § 7 of the Act is not protected as free speech;[1] that an employer's action in closing a plant and laying off employees to discourage union activity is violative of § 8(3) of the Act;[2] and that an employer's threat to close a plant rather than bargain with a union is within the proscription of § 8(1)[3].

It is for the Board to determine the credibility of witnesses and the weight of the evidence. And the question of what inference should be drawn from the evidence is also a function that belongs to the Board. And the possibility of drawing either of two inconsistent inferences from the evidence does not prevent the Board

1. R. R. Donnelley & Sons v. National Labor Relations Board, 7 Cir., 156 F.2d 416; National Labor Relations Board v. LaSalle Steel Co., 7 Cir., 178 F.2d 829; and National Labor Relations Board v. Kropp Forge Co., 7 Cir., 178 F.2d 822.

2. National Labor Relations Board v. Mall Tool Co., 7 Cir., 119 F.2d 700. See also National Labor Relations Board v. Cowell Portland Cement Co., 9 Cir., 148 F.2d 237; National Labor Relations Board v. National Garment Co., 8 Cir., 166 F.

2d 233; and National Labor Relations Board v. Sifers, 10 Cir., 171 F.2d 63.

3. National Labor Relations Board v. Auburn Foundry, 7 Cir., 119 F.2d 331; National Labor Relations Board v. Jahn & Ollier Engraving Co., 7 Cir., 123 F.2d 589; Reliance Mfg. Co. v. National Labor Relations Board, 7 Cir., 125 F.2d 311; Rapid Roller Co. v. National Labor Relations Board, 7 Cir., 126 F.2d 452; and National Labor Relations Board v. American Furnace Co., 7 Cir., 158 F.2d 376.

from drawing one of them.[4] With these principles in mind, I have studied the record. It discloses that the controlling facts upon which the Board predicated its findings are not in dispute. Briefly stated, they are:

On November 20, 1946, United Rubber, Cork, Linoleum and Plastic Workers of America, CIO (hereinafter called the union), which had been organizing the employees, sent a letter to respondent informing it that the union represented a majority of respondent's employees, and requested a meeting for the purpose of negotiating a collective bargaining agreement, and respondent then, for the first time, became aware of the fact that the union had been organizing its employees. Respondent, on November 27, replied, declining to meet in collective bargaining negotiations because the plant had not hired its full complement of personnel.

On December 4, respondent closed the plant, laid off the employees, and its manager handed to each employee a severance notice and instructed them to look in a local newspaper for a statement, a paid advertisement, designated as "Our Policy," which appeared in the newspaper on December 5.[5]

4. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250; National Labor Relations Board v. Nevada Consolidated Copper Co., 316 U.S. 105, 106, 62 S.Ct. 960, 86 L.Ed. 1305.

"Our Policy.

5. "Due to a recent happenstance we bring to the citizenry of Clinton a statement of policy so there will be no misunderstanding, and we use this paid ad as the best means for doing so and not for the purpose of publicly trying a case in the press.

"We selected Clinton as a place in which to locate a midwestern plant, not because of cheap labor but because our tests showed us a supply of labor that was fair, reasonable, intelligent, dependable and good producers.

"In seeking to locate in your city, we made it clear at the outset that we could not pay automotive-parts or similar wages and remain in the business of producing Rubber Footwear, nor could we hope to abide by working conditions set for such industries. We did say—and we mean it—that we would pay the highest wages possible for good work and high productivity that would permit us to compete and provide full-time steady jobs with a fair return to us.

"We hope we shall be able to become a real asset to Clinton by supplying steady work at the best possible wages, and that the Reciprocal Trade Agreement action being started in Washington next month will not return us to a foreign competitive situation which tumbled our wages before.

"Now to the point: Below are appended two letters which speak for themselves. Among other reasons, we have in mind that (1) Before we have a roof over our heads they start shooting and trying to dictate to us. (2) It is obvious that we cannot afford to and will not be bound to a wage pattern as established with the Big Four tire companies. (3) Without adequate bonded assurance, we will not bargain with any Union which has broken faith with a predecessor company entailing great loss to that company. We cannot afford to risk it. (4) When we cannot bargain and conclude a contract in good faith with our own employees at our own plant and economic level, we are certain it will be less costly for us to suspend operations entirely than to operate at a loss.

"While we do not encourage employees to attach themselves to any national organization, we are not opposed to such organization when full consideration is given to our economic limitations and when it conforms strictly to 'at plant-level relations.' This is fully evident from the fact that our Providence Plant has a completely autonomous membership in the AFL.

"At the sacrifice of much time and expense we have endeavored, by temporary arrangements, to supply jobs to the greatest number of people at the earliest possible moment, and to speed the time when they could earn maximum pay by training them ahead of the time when the building would be completed. Apparently this has given the exaggerated idea that we are desperately in need of production, rather than motivated solely by the desire to supply maximum jobs and incomes, as quickly as possible. Since we have apparently been mistaken in our ideas as to what was wanted we have decided to quit operations.

Immediately below the statement there appeared a copy of the union's letter of November 20, requesting recognition, and respondent's reply, denying recognition. December 6, respondent's manager held conferences with a number of the laid-off employees; these employees inquired as to the reason for the closing of the plant, but the manager referred them to "Our Policy." Within a few hours after the close of the last of these conferences, a number of the employees drew up a written statement in which they expressed a willingness to work under and abide by respondent's "stated policy" and 35 of the laid-off employees signed the statement, and on December 11, a letter signed by 29 of the employees stating that they were withdrawing "their request for membership" was mailed to the union. Thereafter, on April 2, 1947, respondent inserted an advertisement in the newspaper that it would begin hiring the next day. Most of the employees responded and were interviewed; those who did not respond were neither interviewed nor considered for reemployment. The interviews were conducted by the manager, his secretary, and respondent's personnel manager. During the interviews, and as a part of the application for reemployment, every applicant was asked to fill out and sign a questionnaire prepared by respondent. The questionnaire began by inquiry whether the applicant had read and understood "Our Policy," a copy of which was displayed on a table before the applicant. Any applicant, during the interview, who indicated that he had not read the policy statement was directed to read it immediately, and any employee who indicated a lack of understanding of the meaning of "Our Policy" was enlightened. The employees were required to state in the questionnaire whether they agreed that respondent's policy was "fair and just and should be upheld," and whether they would "help us to do so."

On July 1, 1947, respondent resumed operations. It did not hire any one of the laid-off employees who failed to indicate complete agreement with respondent's policy and a willingness to assist in its enforcement.

From these facts, the circumstances and inferences reasonably flowing therefrom, and upon the evidence taken as a whole, I see no justification for a reversal of the findings on which the Board's conclusions and order are based; I cannot hold that there was no substantial evidence to support the findings. On the contrary, in the words of Judge Minton in R. R. Donnelley & Sons v. National Labor Relations Board, 7 Cir., 156 F.2d 416, 419, here "were threats and attempts to intimidate the employees if they joined the union." In this state of the record, it cannot be said that the findings of the Board are clearly erroneous. Rather, it seems to me that the Board was justified in finding that the lay-off was anti-union in motive and intent and that respondent closed the plant and laid off its employees to discourage union activity. Consequently, I would enforce the order of the Board.

"We recommend that anyone seeking employment with us that they only seek such employment with this—our policy—firmly in mind, and one which we expect to live up to and expect others to do so, as well. We are not going to all the expense of training anyone only to find out that we cannot later work together. We believe a vast majority will see the fairness of and need for such policy and will actively help us maintain it.

"Goodyear Footwear Corporation,
"(Signed) Jack R. Baker,
"President."