OHIO ASSOCIATED TEL. CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 11327.

United States Court of Appeals
Sixth Circuit.

Decided Nov. 29, 1951.

Sidney Griffith, Columbus, Ohio (Power & Griffith, Donald C. Power, and Sidney D. Griffith, all of Columbus, Ohio, on the brief), for petitioner.

George J. Bott, David P. Findling, A. Norman Somers, Arnold Ordman, Morris A. Solomon, Washington, D. C., on the brief for respondent.

Before HICKS, Chief Judge, SIMONS and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

Upon the complaint of the general counsel of the National Labor Relations Board, Ohio Associated Telephone Company was charged with unfair labor practices in discharging six employees for participation in a strike, for urging employees to abandon the strike and threatening them against engaging in union activities upon its property, all in violation of § 8(a) (1) and (3) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) (1, 3). The regional examiner recommended that the complaint be dismissed in its entirety. Upon exceptions filed by the Union to his intermediate report, the Board entered an order directing the petitioner to cease and desist from discouraging membership in the Union, from instructing its employees to refrain from union activities on company premises during company time; from interfering with them in their right to self organization and to offer immediate and full reinstatement to employees John F. Hachten, Charles C. Kibler and Virginia M. Spires without loss of pay. The petitioner seeks to set aside the order and the Board requests a decree for its enforcement.

In December, 1947, Local 503 of the Ohio Federation of Telephone Workers, Inc., was certified by the Board as the sole collective bargaining agent for the petitioner's non-supervisory employees in the Marion district and on January 3, 1948 the petitioner entered into a collective bargaining agreement with it, effective for one year, and renewable from year to year unless terminated upon notice. On October 27, 1948, the Union notified the petitioner that it desired to terminate the agreement and to negotiate a new one. Negotiations began in December 1948 and continued through January 17, 1949 when they were abruptly broken off by the Union, the principal issue being the Union's demand for a union shop which the petitioner declined to accept. On April 7, 1949, the Union ordered a strike in which approximately all of the employees participated for the first few weeks. A picketline was established in front of the main exchange building and at the front and rear of the plant building. It was maintained until June 15, 1949, when it was withdrawn by reason of a restraining order issued by the Court of Common Pleas of the county based upon numerous acts of violence committed by striking employees, both on and off the picket-line. On July 12, 1949, the Union terminated the strike and notified the petitioner to that effect. Upon receipt of this notice, the petitioner immediately notified all striking employees except six that their jobs were open and that they should return to work. The reason given for not notifying five of the six employees was that they had engaged in such violent

and reprehensible conduct during the strike that their reinstatement as employees was impossible.

The alleged misconduct of the six discharged employees was of such foul, obscene, and violent nature that the petitioner's officers felt forced to take cognizance of it for the Company's protection, the protection of its employees, and the public in general. Its Vice President and General Manager Williams suggested to the employees that they report in writing all acts of violence and the like which were directed at them personally or occurred in their presence. From statements thus secured from non-striking employees and supervisors, it decided not to rehire those thought to have been guilty of the misconduct. The decision was based upon a careful review by Williams in conference with other officials of the Company.

The examiner after a thorough and careful analysis of the evidence recommended the dismissal of the complaint in so far as it was based upon discriminatory discharges. The Union filed exceptions to the intermediate report only in respect to Hachten, Kibler, and Spires, and a probationer by the name of Gladys Erow. His recommendation as to Erow was approved and the complaint as to her dismissed. His recommendation as to Hachten, Kibler and Spires was disapproved and their discriminatory discharge forms the basis for the affirmative directives of the order.

■ The Board in its opinion agrees with the examiner's conclusion that the conduct of the three discharged employees, whose cases are here involved, was of such character, if proved, that the petitioner would have been justified in discharging them. It held, however, that the record does not establish that any of the three engaged in misconduct. The only basis for the examiner's findings in this respect, it urges, is contained in the testimony of management representatives that they received reports of misconduct from employees who claimed to have observed it. In no instance did any of the reporting employees testify as to such misconduct. Therefore, it argues, the testimony of management repre-

sentatives is nothing but hearsay. The written reports were unsworn statements made outside the hearing by persons not subject to cross-examination, uncorroborated by evidence, direct or circumstantial, and have no probative weight. It urges the well established principle that mere uncorroborated hearsay does not constitute substantial evidence. Moreover, it says the record discloses that the petitioner discharged Kibler, Hachten, and Spires because they engaged in concerted strike activity and, accordingly, violated § 8(a) (3). In our judgment, the Board misconceives the scope of the Hearsay rule and misapplies it to the evidence in the present case. True it is that the Company discharged three employees who had been engaged in the strike. But discharge after participating in a strike without more is not conclusive proof that they were discharged *because* they had so participated. Granting that an inference may be drawn from the mere fact of participation followed by discharge that such participation was its cause, the inference disappears when a reasonable explanation is presented that participation in the strike was not the cause of their discharge.

This leads us to a consideration of the true scope of the Hearsay rule and to the issue that was presented by the record to the examiner and the Board. The issue was not whether the discharged strikers had been guilty of misconduct but whether the employer had committed an unfair labor practice. It was the employer who was on trial and the employer alone, and whether it had discharged strikers for union activity or for legitimate cause becomes a question that must be resolved by evidence, direct or circumstantial, which it is our function to review.

As developed by Professor Wigmore (Wigmore on Evidence, 3d Ed. §§ 1788 to 1791): "The Hearsay Rule forbids merely the use of an extra-judicial utterance as an assertion, to evidence the fact asserted. Such a use would be testimonial * * *." What the Hearsay Rule forbids is the use of testimonial evidence, i. e., assertions uttered not under cross examination. If, then, an utterance can be used as circum-

stantial evidence, i. e., without inferring from it an assertion of the fact asserted, the Hearsay Rule does not oppose any barrier because it is not applicable." And, again: "As some definite principle of Relevancy usually governs their use as circumstantial evidence, the precedents for the various classes of utterances can, in most instances, best be collected under the appropriate head of Relevancy * * *."

■ Professor Wigmore considers many decisions. It is necessary to cite but a few. State v. Wall, 167 La. 413, 119 So. 410; Dolson v. Central Businessmen's Association, 235 Mich. 80, 209 N.W. 95, "Where the question is whether the party has acted prudently, wisely, or in good faith, the information on which he acted, whether true or false, is original and material evidence and not hearsay," Friend v. Hamill, 34 Md. 298. Federal cases are not otherwise. Hawkins v. United States, 5 cir., 293 F. 586; N. L. R. B. v. Goodyear Footwear Corporation, 7 cir., 186 F.2d 913, 917; N. L. R. B. v. Reynolds Co., 7 cir., 162 F.2d 680; N.L. R. B. v. Ohio Calcium Co., 6 cir., 133 F.2d 721; Equipment Acceptance Corp. v. Arwood Car Mfg. Co., 6 cir., 117 F.2d 442. See 2 Jones Commentaries on Evidence, 297.

■■ The fact that the reports of misconduct by the persons discharged were received is not controverted, nor are their contents disputed. In an inquiry into the reason for discharge, these reports are not merely admissible but coming from numerous sources they become highly persuasive. As a circumstance indicating ground for discharge, they do not stand alone when considered in their environment. That the employer had no history of anti-union activities or attitudes is reiterated by the examiner, supported by the record, and not disputed by the Board. That there was much misconduct by strikers of the kind reported is not disputed. Of several hundred employees engaged in the strike all were invited to return to their jobs except six and of these the examiner's recommendation was accepted by the Union as to two and approved by the Board as to a third. There was no evidence that those dis-

charged were officers or key persons in the Union or organizers of either the Union or the strike. They were not called as witnesses nor were any persons called to deny the accuracy of the reports upon which the employer acted. Here was not a self-serving explanation of the accused employer, negated by cirumstances sustaining an inference that it was a sham. Rather was it in consonance with all other circumstances. The validity of the ground for the discharge here asserted is to be judged by what reasonable employers, owing a duty to other employees, to stockholders, and the public, would have done in like circumstances. So viewing it, our judgment is that the examiner's finding with respect to the cause of the discharges was, upon the whole record, based upon substantial evidence, unimpeached, and it was not in any way shaken by the Board's reasoning.

■ Another ground for the Board's finding that the petitioner was guilty of unfair labor practices must be considered. In a letter to its employees, on July 6, 1949, six days before the Union terminated the strike, the petitioner said: "If sufficient of our former employees do not return promptly to work we will start hiring new employees so that our expansion program can proceed without delay and demands of the public can be met." The letter also included a statement of belief that the Union was shortsighted in pulling the men out on strike and keeping them out over the issue of a union shop. Standing alone, these observations might have justified the finding of the Board that the petitioner had been guilty of undermining the Union's authority and thereby violating Sec. 8(a) (1) of the Act by interfering with, restraining, and coercing, its employees in the exercise of the rights guaranteed to them. It does not, however, stand alone. The letter recalls to the employees an earlier announcement of the Company that it would continue to furnish telephone service to the general public during the period of emergency, reminds the employees of the Company's obligation to serve the public; of its repeated meetings with the union representative and the United States Conciliation and Mediation Service; the attitude of the Union that any

contract was "out of the window" unless the Union secured its demand for a union shop and its view that it appeared unlikely that any agreement could be reached in the near future. But it advised the employees that their jobs were still open. It must be noted that the strike was called by the Union in the midst of the Company's $1,500,-000 expansion program; that it had a duty to the public, an obligation to the State to keep its service operative and an obligation to its stockholders to protect its franchise. The strike had begun on April 7, 1949, nearly fifteen months prior to the letter. Negotiations for settlement were broken off not by the employer but by the Union. It seems clear that the main purpose of the letter was to safeguard the strikers in their jobs, for a stalemate may not be continued indefinitely. It so impressed the trial examiner, in view of the lack of evidence as to other acts of the petitioner, violative of the Act either prior to, during, or subsequent to, the strike. In such circumstances, it has been held that a communication of this sort, without more, does not violate the Act. N.L.R.B. v. Penokee Veneer Company, 7 Cir., 168 F.2d 868. We agree.

A third violation found by the Board was based upon the testimony of one of the Union's stewards that the petitioner's traffic superintendent and a minor supervisor following the abandonment of the strike had advised her and two other employees that after they returned to work "there would be no mention of Union affairs on Company premises." The petitioner promptly explained, while interviewing operators who were inquiring about their return to duty, and this included nearly all strikers, that references to cessation of union activities on the Company's premises were intended to develop harmony and maintain a general level of telephone service by avoiding incidents. There is no evidence that any formal rule was promulgated or that any effort was made to enforce the informal warning. The examiner considered that the observations were isolated and unrelated to any other issues considered at the hearing, and there was evidence that the petitioner had repudiated the supervisors' observations. The examiner concluded that the record in

this respect did not warrant a finding based solely upon them that the petitioner had violated the Act. The Board disapproved his recommendation in that respect. It must be observed, however, that its disapproval was based in part, if not wholly, upon its conclusion that the petitioner had been guilty of discriminatorily discharging strikers for union activities.

■■ In view of the fact that the examiner heard and saw the witnesses, and the Board did not, it is pertinent to inquire into the relative weight to be given by a reviewing Court to the findings of examiner and Board. While an examiner's findings are not to be given such finality as is accorded to the findings of a Master or District Judge sitting without a jury, and so to be accepted unless clearly erroneous, the substantial evidence standard is not modified in any way when the Board and its examiner disagree, Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S. Ct. 456, 469, 95 L.Ed. 465, the Court holding that "[E]vidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony." It would seem, therefore, that in giving consideration to the whole record, as now we are obliged to do, we may not disregard the superior advantages of the examiner who heard and saw the witnesses for determining their credibility, and so for ascertaining the truth. We consider also that when the Board made its findings, in respect to other unfair labor practice, it had in mind that the petitioner had been guilty of discriminatory discharges by the erroneous application of the Hearsay Rule. We conclude, therefore, that the examiner's findings in respect to sporadic warnings by supervisors, repudiated by the petitioner and never enforced, does not constitute an unfair labor practice in the light of all of the circumstances disclosed by the record, that this finding is sustained by substantial

evidence and that the Board was in error in disapproving the examiner's recommendation.

The order of the Board is set aside and its prayer for enforcement denied.